CLERK'S OFFICE U.S. DISTRICT COURT AT ROANOKE, VA FILED
9/30/2026
LAURA A. AUSTIN, CLERK
BY: s/C. Kemp
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| MONTREIA H., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No: 4:25-cv-00025 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | By: Hon. Thomas T. Cullen |
| | ) | United States District Judge |
| Defendant. | ) | |

---

Plaintiff Montreia H. ("Montreia") filed suit in this court seeking to overturn the Commissioner of the Social Security Administration's ("Commissioner's") final decision denying her claim for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401–433. Montreia suffers from a number of severe ailments, including obesity, type 2 diabetes, lupus, rheumatoid arthritis, chronic pain syndrome, sciatica, and lumbar degenerative disc disease. On review of her application for DIB, an administrative law judge ("ALJ") concluded that, despite these and other conditions, Montreia was not disabled under the Act because she had the capacity to perform sedentary work, as that term is defined in the application regulations, subject to certain limitations. Montreia now challenges that conclusion. Because the ALJ failed to properly consider Montreia's activities of daily living in determining that she can work an eight-hour work day, the court will remand for further consideration.

## I. STANDARD OF REVIEW

The Act authorizes this court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v. Barnhart*, 453 F.3d 559,

561 (4th Cir. 2006). The court's role, however, is limited; it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted). Instead, the court, in reviewing the merits of the Commissioner's final decision, asks only whether the ALJ applied the correct legal standards and whether "substantial evidence" supports the ALJ's findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000).

In this context, "substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted). It is "more than a mere scintilla" of evidence, *id.* (internal quotation omitted), but not "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (internal quotation omitted). But "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) has been working, (2) has a severe impairment that satisfies the Act's duration requirement, (3) has an impairment that meets or equals an impairment listed in the Act's regulations, (4) can return to past relevant work (if any) based on his RFC, and, if not, (5) whether he can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. RELEVANT PROCEDURAL HISTORY AND EVIDENCE

### A. Procedural History

On December 21, 2021, Montreia filed an application for DIB, alleging disability beginning on October 27, 2021. (R. 202–03.) But at a hearing on her claim, she amended her alleged onset date to November 15, 2022, because she had been employed in a full-time position for 11 months prior to that date. (*See* R. 42.) In her application, Montreia alleged disability due to rheumatoid arthritis, chronic low back pain radiating into both legs, chronic bilateral sciatica, lumbar nerve root disorder and herniated lumbar disc, uncontrolled diabetes, swelling in hands and difficulty using them, anxiety, and panic attacks. (R. 90.) Her claim was initially denied on May 16, 2022, and on reconsideration on December 16, 2022. (R. 90-97; 99–108) Montreia requested a hearing before an ALJ on February 15, 2023. (R. 126–27.) That hearing was held on January 8, 2024. (*See* R. 36–89.)

ALJ H. Munday determined that Montreia is not disabled, and denied her claim in a written decision on March 25, 2024. (R. 29.) The ALJ determined that Montreia suffers from a number of severe impairments, including obesity, type 2 diabetes, lupus, rheumatoid arthritis, chronic pain syndrome, sciatica, and lumbar degenerative disc disease, as well as several non-severe impairments. (R. 19–21.) Nevertheless, the ALJ concluded that Montreia retains the residual functional capacity ("RFC") to perform sedentary work, *see* 20 C.F.R. § 404.1567(a), subject to certain additional limitations. (R. 23-27.) And because the ALJ determined that a significant number of jobs exist in the national economy that an individual with Montreia's age, education, work experience, and RFC can perform, she reasoned that she was not disabled within the meaning of the Act. (R. 28–29.)

Montreia subsequently sought review by the Appeals Council, which was denied on March 17, 2025, making the ALJ's decision the final word of the Commissioner. (R. 1.) On May 12, 2025, Montreia filed suit, seeking this court's review. (Compl. [ECF No. 1].)

**B. Legal Framework**

A claimant's RFC is her "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week, despite her medical impairments and related symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). The ALJ makes the RFC finding between steps three and four of the five-step disability determination. *See Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 659 (4th Cir. 2017) (citing 20 C.F.R. § 404.1520(e)). "This RFC assessment is a holistic and fact-specific evaluation; the ALJ cannot conduct it properly without reaching detailed conclusions at step [two] concerning the type and [functional] severity of the claimant's impairments." *Id.*

The Commissioner "has specified the manner in which an ALJ should assess a claimant's RFC." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). First, because the RFC is, by definition, "a function-by-function assessment based upon all of the relevant evidence of [the claimant's] ability to do work-related activities," SSR 96-8p, 1996 WL 374184, at *3, the ALJ must identify each impairment-related functional restriction that is supported by the record, *see Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016). The RFC should reflect credibly established "restrictions caused by medical impairments and their related symptoms"—including those that the ALJ found "non-severe"—that impact the claimant's "capacity to do work-related physical and mental activities" on a regular and continuing basis. SSR 96-8p, 1996 WL 374184, at *1–2.

Second, the ALJ's decision must include a "narrative discussion describing" how specific medical facts and non-medical evidence "support[] each conclusion" in the RFC assessment, SSR 96-8p, 1996 WL 374184, at *7, and logically explain how he weighed any inconsistent or contradictory evidence in arriving at those conclusions, *Thomas*, 916 F.3d at 311. Generally, a reviewing court will affirm the ALJ's RFC findings when he considered all the relevant evidence under the correct legal standards, *see Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th Cir. 2017), and the written decision built an "accurate and logical bridge from that evidence to his conclusion[s]," *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000); *see Shinaberry v. Saul*, 952 F.3d 113, 123–24 (4th Cir. 2020); *Thomas*, 916 F.3d at 311–12; *Patterson*, 846 F.3d at 662–63.

**C. Medical Evidence**

On July 16, 2020, Montreia saw Dr. Jesse Stem for a lumbar spinal surgical evaluation, complaining of "back pain and leg pain." (R. 486.) She reported that her pain was located "across the lower back" and radiated down both legs. (*Id.*) She also reported associated numbness and tingling and that her symptoms had persisted for the past two years. (*Id.*) She noted that the pain and accompanying symptoms are worse with "walking and sitting to a standing position." (*Id.*) Past treatments included heat, ice, NSAIDs, muscle relaxants, narcotic analgesics, three epidural steroid injections ("ESIs"), and physical therapy. (*Id.*) On examination, Montreia had an antalgic gait and her lumbar region was tender to palpation. (R. 488.) Her hips had symmetric range of motion, and motor function demonstrated "some giveaway weakness with manual motor testing." (*Id.*) X-rays of the lumbar spine showed normal lumbar anatomy. (*Id.*) Dr. Stem diagnose Montreia with chronic bilateral low back pain with bilateral sciatica, lumbar radiculopathy, and lumbar disc herniation. (R. 489.) He noted his concern that Montreia has symptomatic lumbar spinal stenosis, and recommended an MRI "to try to better evaluate for nerve root impingement." (*Id.*) He prescribed Topamax for her pain. (*Id.*)

An MRI was performed on July 31, and it showed a circumferential disc bulge with a left paracentral protrusion component, mild to moderate bilateral facet arthropathy, mild left foraminal stenosis, and mild left lateral recess narrowing. (R. 508.) There was "[n]o spinal stenosis at any level." (*Id.*)

Montreia returned to Dr. Stem on August 4 to discuss the results of the MRI. (R. 481.) Montreia reported at that time that her pain was not controlled by her current mediations, and

she denied having any lower extremity weakness. (*Id.*) Dr. Stem noted that the MRI confirmed that Montreia had "symptomatic lumbar spinal stenosis," and recommended a series of transforaminal ESIs. (R. 482.) He doubled her dosage of Topamax, and he noted that she was "not capable of gainful employment at this time." (*Id.*)

Montreia went to the emergency department ("ED") in Martinsville, Virginia, on September 27, 2021, with complaints of kidney pain and blood in her urine (hematuria). (R. 411.) Montreia reported that this had happened once before, but that the pain was much more severe this time. (*Id.*) She was diagnosed with chronic pain syndrome and generalized abdominal pain, and was discharged with instructions to see her primary care physician regarding her elevated blood pressure. (R. 415.)

On October 1, 2021, Montreia met with Dr. Emohare for a pain management consultation. (R. 435.) Her notes indicate that she underwent a left ESI on August 8, 2020, that provided "limited relief," and that her providers had "planned to follow up with a trial of medial branch block, however, she was lost to follow up/COVID positive." (*Id.*) On exam, her blood pressure was elevated (180/90), she reported her pain was 10 out of 10 ("[w]orst pain ever"), her lumbar flexion was limited by pain, and there was pain with flexion, extension, and rotation. (R. 439.) Dr. Emohare noted tenderness with palpation over Montreia's lumbar facet joints, and noted past imaging findings of a small disc bulge at L4-5 and the circumferential disc bulge at L5-S1. (R. 440.) Dr. Emohare recommended medial branch blocks at L4-5 and L5-S1 on the left. (*Id.*) The procedure was performed on October 13 (R. 434), but provided no relief (R. 431).

On October 25, Dr. Emohare gave Montreia another ESI at L4-5. (R. 426–29.) At the time, Dr. Emohare noted that Montreia had a normal gait. (R. 428.)

On January 19, 2022, Montreia had a telehealth appointment with her primary care physician, Dr. Fatade. (R. 538.) Montreia reported that her pain is "constantly present" and presents a "slight limitation on physical activity." (*Id.*) Dr. Fatade prescribed Oxycodone for pain, advised her of the risks associated with opioids, and told her to return in one month. (R. 539.) He also noted that Montreia suffered from "morbid obesity." (*Id.*)

At a follow-up with Dr. Fatade on February 9, Montreia was noted as weighing 270 pounds. (R. 536.) For her height—5'4"—her BMI was calculated to be 46.41. (*Id.*) Montreia reported a reduction in her pain with Oxycodone and "demonstrated an improvement in level of function (Activity), by being able to do her ADL's, IADL and function outside of home." (*Id.*) Dr. Fatade added chronic pain syndrome to Montreia's diagnoses and continued her on Oxycodone. (*Id.*) In follow-up visits in March, April, June, July, and August of 2022, Montreia's records indicate that she again reported that the medication was helping her pain, though her weight remained relatively constant (263 pounds with a BMI of 45.21). (R. 530–33; 574–85.)

Dr. Fatade saw Montreia again in September of 2022 regarding her back pain. (R. 567.) Although she still reported that the medications helped her pain, she also reported that she lies down and uses heat/ice to alleviate her pain. (*Id.*) Records again reflect that she reported that her pain caused a "slight limitation of physical activity." (*Id.*) Montreia also reported that her pain was worse "when she walks or stands for a long period of time." (*Id.*) Her follow-up in October was the same, and Dr. Fatade reported that Montreia was "doing well." (R. 565–

66.) And monthly follow-ups with Dr. Fatade indicated a stable condition with the medications helping Montreia's pain (although she routinely reported her pain as a 6–7 out of 10), and Dr. Fatade prescribed Ozempic in late January 2023 for Montreia's diabetes. (R. 759 (December 1, 2022); 756 (January 3, 2023); 753–55 (January 31, 2023); 750 (February 28, 2023); 747 (March 28, 2023); 743 (April 25, 2023); 741 (May 23, 2023);[1] 737 (June 21, 2023).)

On May 23, 2023, Montreia saw Tyler Kemp, a physician's assistant, for an orthopedic follow-up related to her lower back pain that was radiating down her legs and following a motor vehicle accident the month before. (R. 780.) At that appointment, Montreia reported that, on average, her back and leg pain are both 10 (presumably out of 10) on a visual analog scale.[2] (*Id.*) Montreia denied any lower extremity weakness and relayed that she was trying to get disability. (R. 781.) Her physical exam showed an antalgic gait, tender lumbar region, pain with flexion and extension, 5/5 strength in both legs, and a negative straight-leg raise test. (*Id.*) X-rays revealed disc degeneration at L5-S1 with moderate facet arthrosis. (*Id.*) There was no evidence of new spondylosis or spondylolisthesis, and no evidence of acute osseous abnormality or fracture. (*Id.*) Mr. Kemp recommended a new MRI, and Montreia requested a new pain management provider "for medication/interventional options." (*Id.*) Mr. Kemp arranged for her to see Dr. Swanson at Blue Ridge Pain Management Associates. (R. 781–82.)

Montreia met with Dr. Swanson on June 20, 2023. (R. 706–08.) She reported that "things are bad" and that she was weak and doing little. (R. 706.) Her blood pressure was

---

[1] Montreia's pain medicine was reduced at this appointment, but only because it was an error that she was given a higher dose. (R. 743.)

[2] Montreia saw Dr. Fatade the same day and reported her pain was 6 out of 10. (R. 741.)

140/104, weight was 240 pounds, and her BMI was 41.19. (R. 707.) Dr. Swanson noted that Montreia had a "high" opioid risk score, was struggling at home, her family assistance for activities of daily living was limited, that she was using a walker, and that it was "[t]ime to get serious about health" and that "[o]piates have not helped her!" (R. 706.) A physical exam showed: decreased ranges of motion in cervical, thoracic, and lumbar spine, as well as her shoulders; cervical, thoracic, lumbosacral, and costovertebral tenderness; decreased strength in all four extremities; and 1+ pitting edema in her legs. (R. 707.) Dr. Swanson noted that her care was "poorly managed," there were "little option[s] to help," and advised that Montreia "WALK!" (R. 707.) She was also instructed to follow up in four weeks. (*Id.*)

Montreia continued to see Dr. Fatade for pain management. (*See generally* 723–743 [May thru November of 2023].) Dr. Fatade's records routinely indicate that Montreia reported that she was doing well and that the pain medication was helping. (*See, e.g.*, R 737, 740.) On August 16, 2023, Montreia first reported to Dr. Fatade that she was using a rollator "due to multiple falls." (R. 731.)

On July 24, 2023, Montreia went to the ED in Martinsville complaining of lower back pain and hematuria. (R. 670–76.) During her intake screening, Montreia reported no history of falls. (R. 671.) She rated her back pain as 8 out of 10, and stated that it began two days prior. (*Id.*) Her lab work was "unremarkable," and she was discharged with instructions to follow up with her primary care physician. (R. 676.)

Montreia returned to Blue Ridge Pain Management Associates on July 26, and saw PA-C Megan Coffey. (R. 709–11.) Montreia reported that she was "doing little" and that fatigue lasted all day but got worse at the end of the day. (R. 709.) Findings were virtually unchanged

from her prior appointment with Dr. Swanson, but Ms. Coffey discontinued Montreia's Oxycodone and prescribed Belbuca in its place and ordered an MRI. (R. 710–11.)

The MRI, performed on August 20, showed minimal-to-mild lumbar spondylosis and increased mild posterior narrowing of the disc at L4-5, along with interval resolution of the left paracentral protrusion at L5-S1. (R. 806–07.)

Two days later, on August 22, Montreia saw Dr. Swanson again. (R. 713–15.) He discontinued Belbuca "due to skin issues, lack of efficacy," and started her on hydromorphone. (R. 714.) He also advised her to "walk more, sit less, lose weight," and return in six weeks. (*Id.*)

Monteria returned to see Mr. Kemp on October 11 for a lumbar spine recheck. (R. 770–72.) Physical exam revealed an unstable gait, tender lumbar region, pain with flexion and extension, 5/5 strength in her legs, and a negative straight-leg raise test. (R. 771.) Mr. Kemp reviewed her most recent MRI and noted, "Overall, stable appearing lumbar MRI compared to her 2020 lumbar MRI. No evidence of high-grade canal or neuroforaminal stenosis is noted." (*Id.*) Mr. Kemp did note, however, that Montreia "has not responded to multiple interventions including ESI, facet injection, or medication management." (R. 772.) He advised Montreia that, based on the MRI findings, she was not a surgical candidate, though he referred her to "Dr. Clark to discuss the possibility of undergoing a spinal cord stimulator trial." (*Id.*)

Throughout this time, Montreia continued to see Dr. Fatade, although her findings remained relatively stable. (*See* R. 723–33.) At her December 2023 appointment, Montreia complained of "all over pain" that she rated as 9 out of 10. (R. 822.) Montreia's blood pressure was 140/90, which she attributed to pain, her weight was 263 pounds, and her BMI was 45.14. (R. 822–23.) Dr. Fatade restarted her on Oxycodone. (R. 824.)

**D. Opinion Evidence**

On April 23, 2022, Montreia attended a medical consultation with PA-C Jessica Loveday as part of her claim for DIB. (R. 546–551.) As part of her self-assessment, Monteria reported that she needs assistance bathing and dressing because of her pain, but that she can eat, cook, clean, do dishes, and vacuum on her own. (R. 546.) She reported weakness, loss of vision, shortness of breath, joint pain, back pain, joint swelling, joint stiffness, and numbness, among other symptoms. (R. 547.) On physical examination, Ms. Loveday noted that Montreia could not hold her balance during a heel-to-toe walk, had an antalgic gait, was unable to walk on her heels or toes, was unable to tandem gait, and used a rollator to walk. (R. 548.) Her hip flexion was 4 out of 5, and all other tested strengths were 5 out of 5. (R. 549.) Her range of motion was limited (below "normal range") for her thoracolumbar spine (forward flexion, extension, lateral flexion, and rotation), and hip (flexion, extension, abduction, adduction, and internal rotation). (R. 549.) Ms. Lovejoy also noted that Montreia was "unable to perform gait exercises during exam." (R. 550.) Based on her physical findings and a review of Montreia's self-assessment, Ms. Lovejoy opined that Montreia could frequently lift and carry up to 10 pounds, occasionally lift and carry 11 to 20 lounds, and never carry more than 21 pounds. (R. 550–51.) She assessed that Montreia could sit about six hours in an eight-hour workday and could stand for 2 hours and walk for 2 hours in an eight-hour workday. (R. 551.) She did not ascribe any limitations on Montreia's manipulative activities, and noted that she could occasionally bend or stoop but never kneel or squat. (*Id.*) The only other limitation Ms. Lovejoy found was that Montreia needed a rollator to walk. (*Id.*)

State-agency examiners reviewed Montreia's records at both the initial and reconsideration stages. Her file was reviewed at the initial level by Howard Leizer, Ph.D., and Jack Hutcheson, M.D. (R. 90–97.) They found that Montreia suffered from medically determinable impairments, including severe obesity, arthritis, osteoarthritis, and lumbar spinal stenosis. (R. 93.) They concluded that Montreia could frequently lift and/or carry 10 pounds, and could occasionally climb ramps/stairs, climb ladders/ropes/scaffolds, balance, stoop, kneel, crouch, and crawl. (R. 95.) They found that she had no manipulative, visual, communicative, or environmental limitations, but that her obesity made sedentary work appropriate. (R. 95–96.) They also determined that her mental limitations—anxiety—did not result in any functional limitations. (R. 92.)

At the reconsideration level, Montreia's records were reviewed by Joseph Leizer, Ph.D., and Manish Gambhir, M.D. (R. 99–108.) They concluded that Montreia suffered from the following severe impairments: inflammatory arthritis, obesity, diabetes, osteoarthritis, and lumbar spinal stenosis, and based on the medical records, they concluded that her anxiety was non-severe. (R. 102–03.) For her RFC, they concluded that Montreia should occasionally lift and/or carry 10 pounds and frequently lift and/or carry less than 10 pounds. (R. 105.) They further found that she could frequently climb ramps/stairs, balance, stoop, kneel, crouch, and crawl, and could occasionally climb ladders/ropes/scaffolds. (R. 106.) Unlike the examiners at the initial level, they found certain environmental limitations would be appropriate, including avoiding concentrated exposure to: extreme hot; extreme cold; vibration; fumes, odors, dusts, gases, poor ventilation, etc.; and hazards (machinery, heights, etc.). (*Id.*)

Ultimately, they concluded that Montreia had the RFC to perform work at the sedentary level and was, therefore, not disabled. (R. 107.)

**E. Testimonial Evidence**

On October 28, 2022, Montreia completed a Function Report in connection with her application for DIB benefits. In that document, she relayed that she cannot sit or stand for long periods of time, that her joints are swollen and painful all the time, and that her "whole body is in constant pain." (R. 330.) She stated that she had to "[lie] down a lot during the day" because of "extreme back pain." (*Id.*) Although she was working a full-time job at the time she completed the Function Report, she noted that she worked from her bed, lying down. (R. 331.) She stated that she does not sleep well and often wakes up "in a lot of pain." (*Id.*)

Montreia relayed that her adult daughter helps her with most of her personal care activities, such as dressing, bathing, and shaving. (*Id.*) She even reports that she occasionally needs help cleaning herself after using the bathroom. (*Id.*) She stated that she prepares simple meals, such as sandwiches or microwaveable meals, four times a week, but that she sits on her rollator to do so. (R. 332.) She reported that she does laundry once a week (it takes about 4 hours to do because of frequent breaks, and someone has to take the clothes from the washer to the dryer for her) and washes dishes twice a week (she sits on her rollator and takes about 45 minutes, with breaks). (*Id.*) Her children do all other household chores. (*Id.*) She does not drive—it is too painful—and her children do all the grocery shopping for the house. (R. 333.)

In a section about her abilities, Montreia reported that her illness and conditions affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climbs stairs, complete

tasks, concentrate, and use her hands. (R. 335.) She stated she could walk for one minute before needing a five-minute break. (*Id.*)

At the hearing with the ALJ, Montreia testified about her illness and abilities. She described her pain as "constant" and "all over," but "[m]ainly in [her] back, [her] joint[s]." (R. 45–46.) The only thing that eases the pain is lying down. (R. 46.)

When she wakes in the morning, Montreia goes to the bathroom, showers and dresses with assistance, then returns to bed. (*Id.*) Around 11:00 a.m., her daughter helps her walk laps inside her home for exercise, although Montreia uses a rollator to ambulate and her daughter offers aid as well. (*Id.*) Then she returns to bed and is back up at 2:00 p.m. to go to the bathroom and walk some more before returning to bed again. (R. 47.) All told, Montreia says she spends about six hours a day lying in bed. (R. 46.)

Although the rollator was not prescribed by a physician, Montreia started using it around March of 2023 because she "could just be standing anywhere and [her] legs would just give out and they would give away and [she] just stopped." (R. 49.)

Although doctors have told her she needs to exercise and lose weight, she "can't really get up to exercise." (R. 50.)

When asked about her abilities, Montreia testified that she washes dishes, but that she can only do so until her back gives out, which is "[p]robably five to seven minutes." (R. 50.)

Montreia also reported that she has trouble with her hands and that her children often have to help her comb her hair. (R. 54.) And when she tries to wash dishes, sometimes her hands are too swollen to do so. (*Id.*) Montreia also testified that she is unable to sleep at night,

although she appeared to blame her anxiety more than her pain. (*See* R. 54–55.) She also stated that she hasn't driven since a motor vehicle accident. (R. 55.)

With regard to her full-time employment immediately preceding her amended alleged onset date, Montreia stated that she performed her job mostly while lying in bed. (R. 56.) As her job was essentially responding to inquires on the phone and accessing records on a computer, she could lie in bed to perform the job. (*Id.*) She would get up for Zoom meetings where she had to be on the computer and on camera, but would return to bed when those concluded. (*Id.*) Although she performed the job for 11 months, she states that her employment ended when she learned she was not allowed to lie down on the job and, in any event, funding for the position dried up. (*See* R. 56–62; 69–70.)

When questioned by the ALJ, Montreia said that, sometimes, she can sit up to three hours at a time, while at other times she could sit no more than 45 minutes before needing to lie down. (R. 62.) But on her worst days, she cannot sit for more than 15 to 20 minutes at a time. (*Id.*) She stated that she cannot stand unassisted, but that she could stand for 25 minutes and walk (assisted) with her rollator for 30 minutes. (R. 62–63.) When asked whether she could perform a job that allowed her to alternate between sitting and standing 30 minutes at a time, and she responded that she could not because of her "back. I guess [her] back was giving up." (R. 64.)

Gerald Keating, a vocational examiner, also testified before the ALJ. After discussing Montreia's past relevant work (both as generally performed and as she performed it), he was asked whether, given the ALJ's determined RFC and limiting her to sedentary work, there existed jobs in the national economy that Montreia could perform. He opined that there were,

including document preparer, assembler, and stuffer. (R. 82.) When questioned by Montreia's counsel, Mr. Keating testified that an typical employer would tolerate no more than 10% of time off task and no more than one absence a month. (R. 85.)

**F. The ALJ's Opinion**

The ALJ concluded that Montreia suffered from numerous severe impairments: obesity, type 2 diabetes, lupus, rheumatoid arthritis, chronic pain syndrome, sciatica, and lumbar degenerative disc disease. (R. 19 (citing 20 C.F.R. § 404.1520(c)).) She also discussed other non-severe impairments, including hypertension, parasitic disorder, and neuropathy, and she explained why she determined Montreia's anxiety was non-severe. (R. 20–21.) She found, however, that Montreia did not suffer from "an impairment or combination of impairments" that met or medically equaled one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. (R. 21.)

"After careful consideration of the entire record," the ALJ concluded that Montreia had the RFC

> to perform sedentary work as defined in 20 CFR 404.1567(a) with lifting and/or carrying up to 10 pounds occasionally and less then 10 pounds frequently, standing and/or walking up to 2 hours, and sitting up to 6 hours in an 8-hour workday except occasionally stoop, kneel, crouch, and climb ramps and stairs; no crawling or climb ladders, ropes, and scaffolds; frequent exposure to extreme heat and cold; frequent exposure to vibrations; frequent exposure to pulmonary irritants, including fumes, odors, dust, and gas; occasional exposure to hazardous conditions, including unprotected heights and moving machinery; and uses a rollator walker to ambulate.

(R. 23.) Considering Montreia's age, education, work experience, and RFC, the ALJ determined that she could perform a job that exists in significant numbers in the national

economy, such as document preparer, assembler, and stuffer/blower. (R. 28.) Accordingly, the ALJ found Montreia was not disabled under the Act from the alleged onset date of November 15, 2022, through the date of her decision. (*Id.*)

## III. ANALYSIS

Montreia raises two primary challenges to the ALJ's opinion. First, she contends the ALJ erred in her consideration of Montreia's obesity and its cumulative effects with her other severe impairments. Second, she contends the ALJ's assessment of her subjective symptoms and reported limitations on daily activities is not supported by substantial evidence. Because the court agrees that the ALJ's analysis of Montreia's activities of daily living—the primary rationale given for discounting Montreia's subjective allegations—failed to comply with controlling law and failed to draw and "accurate and logical bridge" from the evidence to her ultimate conclusion, it will sustain her objection and remand this case to the Commissioner. Accordingly, the court need not—and will not—address Montreia's first objection.

When assessing an RFC, an ALJ must consider the limiting impacts of a claimant's physical and mental impairments. 20 C.F.R. §§ 404.1545(a)(1)–(3). When an ALJ considers an impairment with "[s]ymptoms [that] cannot always be measured objectively through clinical or laboratory diagnostic techniques," ALJs must conduct a unique, two-step analysis in evaluating those subjective complaints. SSR 16-3p; *see also* 20 C.F.R. § 404.1529(a); *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 95 (4th Cir. 2020). At the first step, the ALJ must consider "whether objective medical evidence presents a 'medically determinable impairment' that could reasonably be expected to produce claimant's alleged symptoms." *Arakas*, 983 F.3d at 95 (quoting 20 C.F.R. § 404.1529(b); SSR 16-3p, 2016 WL 1119029, at *3). Here, ALJ Munday

found that Montreia's medically determinable impairments could reasonably be expected to cause her symptoms, so she proceeded to the second step. (R. 26.)

At the second step, the ALJ "evaluate[s] the intensity and persistence of [the claimant's] symptoms" to determine the extent to which the symptoms limit an individual's ability "to perform work-related functions." SSR 16-3p, 2016 WL 1119029, at *2. At this stage, the claimant may rely solely on subjective testimony or evidence to establish her impairment, *Hines*, 453 F.3d at 565, and objective evidence is not required to find the claimant disabled, *see* SSR 16-3p 2016 WL 119029, at *4–5 ("Symptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques."). Accordingly, under *Arakas*, the ALJ "may 'not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate' them." 983 F.3d at 95 (quoting SSR 16-3p, 2016 WL 1119029, at *4–5). The ALJ, however, "is not required to accept the claimant's statements at face value; rather, the ALJ must 'evaluate whether the statements are consistent with the objective medical evidence and other evidence.'" *Piacitelli v. O'Malley*, No. 7:22-CV-193-FL, 2024 WL 996740, at *6 (E.D.N.C. Feb. 12, 2024) (quoting SSR 16-3p, 2016 WL 1119029, at *6); *see also Craig v. Chater*, 76. F.3d 585, 595 (1996) (explaining that the ALJ must consider whether a claimant's subjective complaints could "reasonably be accepted as consistent with the objective medical evidence and other evidence"), *superseded by statute on other grounds*.

One of the most valuable pieces of non-medical evidence an ALJ considers when determining whether a claimant's statements are consistent with the medical evidence is a claimant's activities of daily living. But "[a]n ALJ may not consider the *type* of activities a

claimant can perform without also considering the *extent* to which she can perform them." *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (citing *Brown v. Commissioner*, 873 F.3d 251, 263 (4th Cir. 2017)). Here, the ALJ did just that—cited Montreia's *ability* to perform some activities without noting *how little* she actually performs them.

The ALJ's reasons for concluding that Montreia's daily activities undermined her allegations of debilitating pain comprise a single paragraph:

> As for the claimant's statements about the intensity, persistence, and limiting effects of her symptoms, they are inconsistent because the record is more consistent with finding less restrictive limitations. The claimant testified that she spent most of her time lying down due to pain; however, the claimant frequently told her primary care provider that her pain only imposed a slight limitation on her physical activity and she noted that she could independently cook, feed herself, clean, wash dishes, and vacuum during her April 2022 consultative examination. When the claimant did report spending much of her time resting, her pain management providers advised her to sit less and walk more to treat her pain symptoms and the claimant acknowledged that she could still independently bathe, dress, toilet, get out of beds and chairs, and feed herself during her June 2023 emergency department visit for back pain. (Exs. 6F/1; 12F/68; 13F/9; 14F/14, 16, 19, 26, 29, 32, 35, 38, 41, 44, 49). These factors, taken in combination with the claimant's physical examinations showing elevated BMI; only infrequent and generally minor deficits of strength or range of motion or abnormalities of gait; finding consistently intact sensation, reflexes, coordination, and station; and noting that she could sit comfortable during examinations support finding her able to perform a range of sedentary exertional tasks; occasionally stoop, kneel, crouch, and climb ramps and stairs; and tolerate frequent exposure to extreme heat and cold and pulmonary irritants. (Exs. 6F/3-5; 12F/65-66, 70-71; 13F/1-10; 14F/9, 17, 20, 23, 27, 30, 33, 36, 39, 42, 45, 50; 15F/5, 15; 17F/2-3, 13-14).

(R. 26.) This analysis has two flaws. First, the reference to Montreia's statements to her primary care physician—while accurate—overlooks what should be apparent to anyone reviewing the

records: they appear to be a copy-and-paste of past meeting notes. (*Compare* R. 538 [January 19, 2022] *with* 530 [April 5, 2022] (containing identical paragraphs under the "Subjective" section of the medical chart, with the exception of Montreia's pain rating that day and the omission of an errant comma).) Second, and more fundamentally, the references to Montreia's daily activities do not acknowledge, let alone grapple with, the undisputed evidence of how *little* she performs them. For example, the ALJ says Montreia told the consultative examiner "that she could independently cook, feed herself, clean, wash dishes, and vacuum." (*Id.*; *see also* R. 546.) That's accurate, so far as it goes. But all Montreia told the examiner was she was able to perform those functions; the records reveal how *infrequently* she does them, and she often performs them with help. She can cook, insofar as she puts something in the microwave four times per week. (R. 332.) She also washes dishes, but she only does so twice a week, must sit on her rollator to wash them, can only work on the task for five to seven minutes at a time, must take frequent breaks, and can take up to 45 minutes to accomplish this menial task. (*Id.*; *see also* R. 50.) *See* SSR 96-8p, 1996 WL 374184, at *7 (requiring the ALJ's decision to include a "narrative discussion describing" how specific non-medical evidence "supports each conclusion" in the RFC assessment).

The ALJ's error is much like the error in *Brown*. There, the Fourth Circuit reasoned:

> With respect to the first reason for the adverse credibility finding, the ALJ noted that Brown testified to daily activities of living that included "cooking, driving, doing laundry, collecting coins, attending church and shopping." *See* Second ALJ Decision 11. The ALJ did not acknowledge the extent of those activities as described by Brown, e.g., that he simply prepared meals in his microwave, could drive only short distances without significant discomfort, only occasionally did laundry and looked at coins, and, by the time of the second ALJ hearing, had discontinued regular attendance at church and limited his shopping to just

> thirty minutes once a week. Moreover, the ALJ provided no explanation as to how those particular activities—or any of the activities depicted by Brown—showed that he could persist through an eight-hour workday.

*Brown*, 873 F.3d at 263. The same is true here. While Montreia may do laundry with assistance, cook in a microwave, or clean occasionally, those facts, standing alone, are insufficient to justify the ALJ's rejection of her detailed subjective allegations.

The ALJ must "build an accurate and logical bridge from the evidence to his conclusion." *Monroe v. Colvin*, 826 F.3d 176, 189 (2016) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)). When considering the whole record, the court cannot say that the ALJ explained how Montreia's limited daily activities equate to a finding that she can work eight hours a day, five days a week. *See* SSR 96-8p, 1996 WL 374184, at *2. Maybe she can, But the ALJ must do more to explain why she believes that is the case. .

## IV. CONCLUSION

For the foregoing reasons, the court will remand the ALJ's finding that Montreia is not disabled.

The Clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to the parties.

**ENTERED** this 30th day of September, 2026.

*/s/Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE